IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Ashley Bard, individually and as the | : | |
| administrator for the Estate of Zachary | : | Case No. 1:15-cv-643 |
| Ryan Goldson, | : | |
| | : | Judge Susan J. Dlott |
| Plaintiff, | : | |
| | : | Order Granting in Part and Denying in |
| v. | : | Part Motion for Summary Judgment |
| | : | |
| Brown County, Ohio, *et al.* | : | |
| | : | |
| Defendants. | : | |

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 77). This case arises from the death of Zachary Ryan Goldson while he was in custody at the Brown County Jail. Multiple corrections officers have testified that he was found hanging from a bed sheet tied around the sprinkler assembly in the ceiling of his holding cell in the predawn hours of October 5, 2013.

Questions have persisted about Goldson's death. Goldson had been hospitalized briefly on the night of his death after he swallowed a pen. He then attacked and injured a Brown County Sheriff's deputy at the hospital when the deputy was escorting him to his cruiser to transfer him back to the jail. A nurse called for help, and several law enforcement officers responded to the emergency call to regain custody and control of Goldson. One officer who responded, Deputy Ryan Wedmore, called Goldson a "mother fucker[,]" said he wanted to "break [Goldson's] fucking neck[,]" and said Goldson would be getting a "welcome party" back at the jail. Goldson was found dead in his jail holding cell approximately one hour later. Some evidence suggests that it would have been difficult based on the physical layout of the jail cell for an inmate acting

alone to have hung himself. However, forensic pathologists, a county grand jury, and a state criminal investigations unit all determined that Goldson committed suicide by hanging.

On October 10, 2015, Plaintiff Ashley Bard, the administrator of Goldson's estate, filed suit against Brown County, the Brown County Sheriff, and several other law enforcement officers asserting that Goldson's hanging was staged and that they are liable for his death. The parties engaged in more than two years of discovery, at the conclusion of which Defendants moved for summary judgment. The Court then held an extensive oral argument hearing on the motion. For the reasons that follow, the Court finds that although some factual disputes remain, all but one of Plaintiff's claims fail for a lack of sufficient evidence. Plaintiff has not put forward sufficient evidence to prove that any particular officer used unreasonable and excessive force against Goldson, failed to intervene against the use of excessive force against him, or was deliberately indifferent to his medical needs. Plaintiff can proceed to trial only on the intentional infliction of emotional distress claim against Deputy Wedmore, the officer who directed profanity toward and threatened Goldson at the hospital. Accordingly, the Court will **GRANT IN PART AND DENY IN PART** Defendants' Motion for Summary Judgment.

## I.     BACKGROUND

### A.     Factual History

The following facts are derived from Defendants' Statement of Proposed Undisputed Facts (Doc. 77-1) and Plaintiff's Response (Doc. 102-2) except where specifically noted otherwise.

#### 1.     Incarceration and Death of Zachary Goldson

Goldson was arrested on September 26, 2013 following an indictment issued by a Brown County, Ohio grand jury on three weapons charges. Officer Thomas Ackley booked Goldson

into the Brown County Jail on the same date.  (Doc. 77-2 at PageID 3184.)  Officer Ackley completed a medical and mental health screening of Goldson that same day during which Goldson gave no negative health information.  (*Id.* at PageID 3186.)  Specifically, Goldson denied being treated for mental health problems, feeling depressed or suicidal, requiring medication, or having been treated for a drug addiction.  (*Id.*)

On October 4, 2013, Goldson swallowed an ink pen made primarily of plastic.  The Brown County Sheriff transported Goldson to the local hospital emergency room for treatment.  This was Goldson's second visit to a hospital for swallowing potentially dangerous items during the same period of incarceration at the jail.  Goldson was released from the hospital and transported back to the jail on October 4, 2013.  At the jail he remained in the blue paper suit he wore at the hospital, and he was placed in holding cell 15 to wait for the swallowed items to pass through his system.  (Schadle Dep., Doc. 76-1 at PageID 2992–2993.)[1]

Goldson complained about stomach pain that night.  Brown County Sheriff's Deputy Travis Justice transported him to the Southwest Regional Medical Center at approximately 11:10 p.m.  Goldson was examined by a registered nurse who determined that he was not suicidal.  Dr. Mark Thorton also did a brief psychological examination of Goldson to determine whether he was calm and cooperative.  (Doc. 74-11 at PageID 1210.)  He did not extensively question Goldson to determine whether he was depressed or whether he had swallowed items to harm

---

[1]  Plaintiff points out a dispute of fact about the significance of the blue suit Goldson was wearing.  Corrections Officer Zane Schadle testified at his deposition that inmates ordinarily wore black and white striped clothing, but that they would be placed in a blue or green smock if they were on suicide watch or in blue paper clothing if they were on medical watch.  (Doc. 76-1 at PageID 2991–2992.)  On the other hand, Dustin Downing, a trusty inmate at the jail with Goldson, believed that Goldson was on suicide watch because he thought wearing a blue paper suit signified the inmate was on suicide watch.  (Doc. 97-10 at PageID 4182.)  The standard operating procedure differed for inmates on suicide watch versus inmates on medical watch.  Officers checked inmates on suicide watch every ten minutes, but they checked inmates on medical watch every thirty minutes.  (Schadle Dep., Doc. 76-1 at PageID 2996.)  Plaintiff does not make any argument in the summary judgment briefings, however, that Defendants breached any duty to Goldson in regards to his watch status.

himself. (*Id.*) Dr. Thorton performed a CAT scan to locate the swallowed items, arranged for Goldson to receive follow-up treatment, and discharged him in the early morning hours of October 5, 2013.

Before exiting the hospital, Deputy Justice prepared Goldson for transport by placing shackles on his ankles and a transport belt around Goldson's waist. Deputy Justice handcuffed Goldson's wrists in front of his body and through the ring on the transport belt. Deputy Justice then escorted Goldson out of the hospital and towards his cruiser approximately fifty feet away. Deputy Justice had to unlock the cruiser doors. He positioned Goldson at the rear driver's side door of the cruiser to his right. Goldson partially freed himself from his restraints and struck Deputy Justice in the back of the head. Goldson had a handcuff and a leg shackle off. Goldson tried to grab Deputy Justice's firearm, so Deputy Justice tossed the firearm ten to fifteen feet away. Deputy Justice and Goldson engaged in a physical struggle during which they fell to the ground and rolled down a hillside, Goldson struck Deputy Justice in the face with his handcuff, and Deputy Justice called for help.

A nurse called 911. Dr. Thorton and other staff members went to help Deputy Justice. Goldson actively resisted efforts by Deputy Justice and three medical staff to hold him on the ground. Medical personnel helped hold Goldson down until more officers arrived to secure him in handcuffs. (Doc. 98-1, Georgetown PD Dashcam at 3:17 to 3:32.)[2] Two Georgetown Police Department officers responded to the 911 call. They secured Goldson, handcuffing his arms behind his back as he lay on the ground on his stomach. (*Id.* at 3:32 to 4:26.) A nurse remained next to Goldson from the time he was handcuffed while lying with his stomach on the ground until the time he dry heaved and then started to catch his breath. (*Id.* at 3:32 to 4:10.) A

---

[2] The Court is using Plaintiff's nomenclature for the video evidence, such as Georgetown PD Dashcam.

Georgetown police officer was kneeling on the ground beside Goldson after he was handcuffed. It appears the officer had one knee on Goldson's back. (*Id.* at 3:32 to 5:41.) Another officer held Goldson's handcuffed arms up in the air over his shoulder blades for over one minute. (*Id.* at 3:32 to 4:37.) Goldson then remained on his stomach on the ground with his hands cuffed behind his back and his legs shackled, with the officer putting pressure on his back for approximately one more minute. (*Id.* at 4:37 to 5:35.)

Corporal Larry Meyer[3] from the Brown County Sheriff's Department arrived just as the officers were handcuffing Goldson's arms behind his back. (*Id.* at 3:37.) Corporal Meyer denied that he heard any sounds from Goldson that sounded like he was trying to regurgitate, but the dry heaves can be heard clearly on the dashcam video. (Meyer Dep., Doc. 75-3 at PageID 2007–2008; Doc. 98-1, Georgetown PD Dashcam at 3:45 to 3:52.) Corporal Meyer saw that Goldson had gotten off one handcuff and one leg shackle—from the sets put on by Deputy Justice. (Doc. 75-3 at PageID 1999–2002.) He returned to his cruiser to get another set of shackles. (*Id.* at PageID 2000; Doc. 98-1, Georgetown PD Dashcam at 3:51.)

Deputy Ryan Wedmore from the Brown County Sheriff's Department arrived at the scene when Corporal Meyer was back at his cruiser and after Goldson had dry-heaved. (Doc. 98-1, Georgetown PD Dashcam at 4:35.) The Georgetown police officers were lowering Goldson's handcuffed arms from the air to his back as Deputy Wedmore walked up. (*Id.* at 4:35 to 4:37.) Deputy Wedmore approached Goldson and said "what the fuck is wrong with you, you stupid mother fucker" and "I'd like to break your fucking neck" and "I hope you like prison, bitch." (*Id.* at 4:37 to 5:24; Doc. 75-6 at PageID 2473–76.) Deputy Wedmore did not touch

---

[3] For simplicity, the Court will refer to the individual defendants using the rank they had at the time of the events in question.

Goldson during this tirade. (Doc. 98-1, Georgetown PD Dashcam at 4:37 to 5:08; Doc. 75-6 at PageID 2473–76.)

Corporal Meyer arrived back from his cruiser with a second set of leg shackles, but at that same time an unidentified person was able to re-secure the original shackles around Goldson's legs. (Doc. 98-1, Georgetown PD Dashcam at 4:51 to 5:13; Meyer Dep., Doc. 75-3 at PageID 1999–2001.) Within approximately fifteen seconds after the leg shackles were put on Goldson, the officers lifted Goldson off the ground and escorted him to the cruiser. (Doc. 98-1, Georgetown P.D. Dashcam at 5:13 to 5:45.) Corporal Meyer had his hand or arm around Goldson's arm as the officers escorted Goldson to the cruiser. (Meyer Dep., Doc. 75-3 at PageID 2003.)

Goldson repeatedly grunted in pain and said "I didn't mean to" as he was walked to the cruiser. (Doc. 98-1, Georgetown PD Dashcam at 4:27 to 5:43.) Deputy Wedmore stated "that motherfucker is getting a welcome party when we get to the jail." (*Id.* at 5:47 to 5:52; Wedmore Dep., Doc. 75-6 at PageID 2484.) The officers placed Goldson in the back seat of the cruiser. Deputy Wedmore transported Goldson from the hospital back to the jail, and Deputy Justice received treatment for his injuries at the medical center.

Deputy Wedmore parked his cruiser in the sally port at the Brown County Jail at approximately 2:32 a.m. on October 5, 2013. Corporal Jason Huff from the Brown County Sheriff's Office, along with Corrections Officer ("CO") George Dunning and CO Zane Schadle from the Brown County Jail, were present in the sally port when Deputy Wedmore returned with Goldson. Goldson was lying down in the cruiser with his feet pointed towards the passenger side door when the cruiser arrived. He was wearing leg shackles, the transport belt, and his hands

were cuffed behind his back.[4]  Corporal Huff pulled Goldson from the cruiser feet first without

securing the top half of his body.  He testified that he wanted to act quickly to prevent Goldson

from attempting to escape again.  (Doc. 75-7 at PageID 2663.)  Goldson's upper body fell

heavily to the floor.  Corporal Huff testified that Goldson's head did not hit the floor, and he

stated that Goldson landed on his shoulder and side area.  (*Id.* at PageID 2659.)  Plaintiff asserts

based on the video evidence that Goldson fell face first, but the Court cannot tell from the videos

whether he landed on his chest, shoulders, or face.  (Doc. 98-1, Sallyport Video 10-5-13; Doc.

98-1, Sally Port video at 13:43 to 14:00.)[5]

Corporal Huff, Deputy Wedmore, and CO Dunning then walked Goldson backwards

from the sally port to holding cell 15.  CO Schadle held open the sally port door.  CO Dunning

and CO Schadle took Goldson into holding cell 15 and placed him face down on the ground with

his face turned away from the door.  (Schadle Dep., Doc. 76-1 at PageID 3063; Dunning Dep.

Doc. 75-5 at PageID 2270.)  Corporal Huff and Deputy Wedmore remained in the hallway.  The

officers testified that they removed the handcuffs, shackles, and transport belt from Goldson in

the cell.  (Schadle Dep., Doc. 76-1 at PageID 3051–3052; Dunning Dep., Doc. 75-5 at PageID

2271–2272; Huff Dep., Doc. 75-7 at PageID 2676.)  CO Dunning specifically testified that the

shackles were taken out of the holding cell.  (Dunning Dep., Doc. 75-5 at PageID 2271.)  CO

Schadle warned Goldson he would be tased if he attempted to stand up.  (*Id.* at PageID 2275.)

The officers also removed a blanket and a pair of shoes from Goldson's cell.  (Schadle Dep.,

Doc. 76-1 at 3055–3056.)  CO Schadle testified that he removed the blanket because another

prisoner had once used his blanket to stop officers from deploying a taser.  (*Id.* at PageID 3054–

---

[4] Orange handcuffs which Deputy Justice had placed on Goldson were still attached to the transport belt, but they were not secured on Goldson's body.  (Schadle Dep., Doc. 76-1 at PageID 3052–3053.)

[5] The Sally Port video is taken from a different angle than the Sallyport Video 10-5-13.

55.)  CO Huff testified that the officers did not hit Goldson when they were in the cell.  (Doc. 75-7 at PageID 2691.)  CO Schadle and CO Dunning exited the holding cell and closed the door at approximately 2:34 a.m.  (Doc. 98-1, Goldson Placement in Cell at 1:02.)

At around 2:36 a.m., after moving his cruiser out of the sally port, Deputy Wedmore retrieved the handcuffs placed on Goldson at the hospital by the Georgetown police officers.  (Wedmore Dep., Doc. 75-6 at PageID 2513, 548–2549.)  Deputy Wedmore and Corporal Huff then returned to the hospital to check on Deputy Justice and retrieve his cruiser after Goldson was placed in his cell.  (Huff Dep., Doc. 75-7 at PageID 2687, 2691; Wedmore Dep., Doc. 75-6 at PageID 2516.)

CO Sarah McKinzie was at the dispatch desk from the time that Goldson arrived at the sally port through the time that the door to holding cell 15 was closed.  She watched the officers put Goldson in the cell on the video monitors.  CO McKinzie then went outside to take a smoking break.  She testified during her 2018 deposition that she went back inside to bag the handcuffs and restraint belt for evidence because Corporal Meyer requested that she do so.  (Doc. 75-8 at PageID 2838, 2863–2865.)  She twice corrected herself to clarify that she bagged the transport belt, but not the shackles, that evening.  (*Id.* at 2838, 2863.)

However, in her recorded interview with the Ohio Bureau of Criminal Investigations ("BCI") immediately after the death of Goldson, CO McKinzie stated that she had bagged the cuffs and shackles, not the cuff and transport belt.  She first stated that the officers removed the "cuffs and belt" from holding cell 15.  (Doc. 98-1, McKinzie Interview BCI at 7:14 to 7:21.)  She also stated in the same interview that she saw the officers come out of holding cell 15 with the shackles before shutting the door.  (*Id.* at 9:26 to 9:30.)  She stated that she later retrieved the shackles for evidence:  "We were asked to grab the shackles that he had already picked up and

put in the booking room and put them in a paper bag for evidence for the altercation." (*Id.* at 3:05 to 3:16, 4:50 to 5:30, 10:35 to 11:00.) CO McKinzie can be seen in the hallway video retrieving a paper sack and carrying it into another room down the hallway from holding cell 15 at 2:54 a.m. (Doc. 98-1, Goldson Placement in Cell at 5:15 to 5:35.)

At approximately 2:58 a.m., about one-half hour after Goldson was locked in the cell and four minutes after CO McKinzie retrieved the paper bag and walked down the hallway, CO Schadle looked into the window of holding cell 15 as he was walking to the commissary with CO Dunning to get a drink. CO McKinzie was in the holding cell hallway at the same time. (*Id.* at 5:43 to 6:00.) CO Schadle and CO Dunning testified that they saw Goldson hanging by a sheet tied around the sprinkler assembly in the ceiling of the cell. (Schadle Dep., Doc. 76-1 at PageID 3087–3090; Dunning Dep., Doc. 75-5 at PageID 2361.)

Plaintiff asserts that CO Schadle did not see Goldson hanging when he looked in the cell because "Schadle is seen looking DOWN on the ground at the body of Mr. Goldson." (Doc. 102-2 at PageID 4283.) The Court has reviewed the video of the holding cell hallway. The Court can tell from the video that CO Schadle is looking into the cell window, but the Court cannot tell whether he is looking up, down, or straight ahead. (Doc. 98-1, Goldson Placement in Cell at 5:50 to 5:54.) Plaintiff also argues that it was physically impossible for Goldson to have hung himself, but that evidence will be discussed below.

CO Schadle unlocked the door to holding cell 15 and entered. CO McKinzie ran to the booking room phone to call the communications center to request a life squad, and then she returned to Goldson's holding cell. According to the officers, CO Schadle grabbed hold of Goldson's body, and CO Dunning grabbed hold of Goldson with one arm and cut the sheet with a pocket knife with his second arm. (Dunning Dep., Doc. 75-5 at PageID 2352, 2360; Schadle

Dep., Doc. 76-1 at PageID 3093.) CO Dunning and CO Schadle lowered Goldson to the floor face up, and then turned him onto his stomach. (Schadle Dep., Doc. 76-1 at PageID 3096.) CO Schadle took handcuffs from CO Dunning and handcuffed Goldson's arms behind his back. (*Id.* at PageID 3097.) CO Dunning testified the handcuffs were used because Goldson had attacked a sheriff's deputy earlier that night. (Doc. 75-5 at PageID 2352.) CO Schadle then began chest compressions, but he could not find a pulse. (*Id.* at PageID 2359–2360; Schadle Dep, Doc. 76-1 at PageID 3098–99.) CO Schadle sent CO Dunning to find a stethoscope to listen for heart sounds. (Schadle Dep., Doc. 76-1 at PageID 3099; Dunning Dep., Doc. 75-5 at PageID 2359.) CO Schadle stopped giving chest compressions after Corporal Huff arrived at the scene and directed him to stop. (Schadle Dep., Doc. 76-1 at PageID 3102; Huff Dep., Doc. 75-7 at PageID 2703, 2706–2708.) Corporal Huff testified that he had "seen enough dead bodies to know that [Goldson] wasn't going to be saved." (Doc. 75-7 at PageID 2703.) He knew the paramedics would be arriving shortly at the jail. (*Id.* at PageID 2707.)

The Georgetown Life Squad paramedics arrived at approximately 3:10 a.m. CO Schadle had stopped administering chest compressions before the paramedics arrived. (Ridner Dep., Doc. 74-17 at PageID 1846–1847.) The paramedics determined that Goldson was asystole. Paramedic Sherry Ridner confirmed that Goldson was dead at 3:13 a.m. She testified that Goldson had a "small abrasion to his left cheek" when she examined him. (*Id.* at PageID 1846.) She could not tell if the abrasion was "fresh" or "something that might have been there for some time." (*Id.*)

Based on the video of the jail holding cell hallway, no one entered holding cell 15 from the time that the officers closed the door at approximately 2:34 a.m. until approximately 2:58

a.m. when CO Schadle appeared to find Goldson hanging.  (Doc. 98-1, Goldson Placement in Cell at 1:00 to 6:00.)

Detective Buddy Moore, the night shift supervisor for the Brown County Sheriff's Office in 2013, acknowledged that on the morning of Goldson's death he told Dr. Judith Varnau, then the Brown County Coroner, that he first learned about the death at 2:46 a.m.  (Moore Dep., Doc. 90-2 at PageID 3594, 3612.)  He based his statement to her on a quick check of the call log on his telephone as to when calls were made.  (*Id.* at PageID 3612.)  However, he corrected that statement when he was interviewed by BCI about Goldson's death on November 5, 2013.  (*Id.* at 3619–3620.)  He explained at his deposition that he told Corporal Meyer around 2:46 a.m. that he was headed to the hospital because that is where Deputy Justice had been assaulted and was being treated.  He explained that he did not learn about Goldson's death from Corporal Meyer until a 3:01 a.m. phone call.  (*Id.* at PageID 3609, 3612, 3619–3620.)

Brown County Sheriff Dwayne Wenninger had no involvement or interaction with Goldson on October 4 or 5, 2013.

### 2.     Investigations into the Death of Zachary Goldson

The Brown County Sheriff's Office reported Goldson's death to the Ohio BCI and to Dr. Judith Varnau, then the Brown County Coroner, on the day he died.  Goldson's body was transported to the Montgomery County, Ohio Coroner's Office for an autopsy that same day because Dr. Varnau, a doctor of obstetrics and gynecology, was not qualified to perform autopsies.

The Montgomery County Deputy Coroner, Dr. Susan Allen, performed the autopsy.  Dr. Allen, a forensic pathologist, preliminarily concluded as follows:

> Regarding the autopsy I performed on a body identified as Zachary Ryan
> Goldson, a 24-year-old white male (CC-13-3905), the preliminary gross
> anatomic findings are:
> I. Hanging by the neck:
>    A. Cervical pressure furrow and anterior neck abrasion.
>    B. No internal neck injuries.
> II. Foreign objects (pen and toothbrush) recovered from gastric contents.
> III. Abrasions of the nose, back, left forearm, and ankles.

(Doc. 74-4 at PageID 927.)  In the final postmortem examination report, Dr. Allen described the

abrasions as a ¼-inch abrasion on the bridge of the nose, a one-inch abrasion on the left middle

back, a ½-inch abrasion on the left forearm, and multiple abrasions on the ankles between ¼ to

½-inch each.  (Doc. 74-3 at PageID 923.)  Dr. Allen removed the term "hanging by neck" from

the final postmortem examination report at the request of Dr. Varnau.  (Allen Dep., Doc. 74-2 at

PageID 840–41.)  Dr. Varnau testified at her deposition that she asked the Montgomery County

Coroner to "give facts only."  (J. Varnau Dep., Doc. 74-15 at PageID 1633.)  However, Dr. Allen

testified that it was her opinion to a reasonable degree of medical certainty that Goldson died

from hanging, and she did not find any evidence consistent with Goldson having been hogtied or

strangled.  (*Id.* at PageID 837, 841–42.)

The Montgomery County Coroner, Dr. Kent Harshbarger, and four other forensic

pathologists associated with the Montgomery County Coroner's Office reviewed Dr. Allen's

work and agreed with her that Goldson's death was "consistent with suicide and cause of death

hanging."  (Harshbarger Dep., Doc. 74-5 at PageID 952; Doc. 74-6 at PageID 980.)  They also

agreed that the death was inconsistent with death by strangulation.  (Harshbarger Dep., Doc. 74-5

at PageID 952; Doc. 74-6 at PageID 980.)  At his deposition, Dr. Harshbarger agreed that a

hanging death could be the result of either a suicide or a homicide.  (Doc. 74-5 at PageID 968–

969.)

Dr. Varnau issued a supplementary certificate of death for Goldson on November 30, 2013 in which she listed the final determination as to the cause and manner of Mr. Goldson's death as "strangulation" and "homicide." (Doc. 74-15 at PageID 1540; Doc. 74-16 at PageID 1808.)[6]

The Ohio BCI also investigated Goldson's death. BCI observed the death scene, conducted interviews, and gathered evidence. BCI's Cybercrimes Unit inspected the surveillance video from the Brown County Jail from October 4 and 5, 2013. The surveillance camera recorded areas near, but not inside, holding cell 15. BCI "found no evidence to suggest any tampering" with the surveillance video or evidence. (Root Dep., Doc. 74-7 at PageID 1027.) BCI concluded that any gaps or jumps in time in the surveillance video occurred because the system was designed only to record when it sensed motion. (*Id.* at PageID 1051; Doc. 74-8 at PageID 1083.)[7]

As part of its investigation, BCI examined whether Goldson could have reached the sprinkler assembly to tie a bed sheet around it. The BCI investigators determined it was possible. (Hornyak Dep., Doc. 74-1 at PageID 766–767; Schuler Dep., Doc. 74-9 at PageID 1139–40.) BCI found no evidence that a Brown County law enforcement official assaulted or used unnecessary force on Goldson. (Hornyak Dep., Doc. 74-1 at PageID 783.) The BCI crime

---

[6] Dr. Varnau continued to investigate the cause of death after issuing this final determination. However, on January 5, 2015, the Brown County Court of Common Pleas temporarily enjoined Dr. Varnau from conducting a coroner's inquest, and on September 8, 2016, the court permanently enjoined her from "engaging in any activity whatsoever concerning the mode, manner and cause of death of Zachary Goldson." (J. Varnau Dep., Doc. 74-15 at PageID 1578–1579.) The court also sanctioned Dr. Varnau $7,500. Dr. Varnau appealed, but the Ohio Court of Appeals for the Twelfth District upheld the lower court orders. *Dunning v. Varnau*, 95 N.E.3d 587 (Ohio App. 2017), *appeal not allowed by*, 152 Ohio St. 3d 1425 (2018).

[7] Plaintiff asserts that the surveillance video has been tampered with or altered. (Doc. 102-2 at PageID ID 4286–4287.) She points out that there are jumps in time in the surveillance video entitled Goldson Placement in Cell 10-5-13 (Doc. 98-1). However, Plaintiff offers no admissible evidence to support the argument that the video was tampered with or altered. The PowerPoint presentation entitled "Hallway Video Tampered PDF" (Doc. 97-11) and the Hallway Video Tampered PowerPoint with Links to audio and video clips (Doc. 98-1) are inadmissible as determined in the December 31, 2018 Order (Doc. 114).

scene investigator determined that the crime scene was consistent with a suicide, and she does not believe that Goldson was murdered. (Schuler Dep., Doc. 74-9 at PageID 1143.)

A Grand Jury of the Brown County Court of Common Pleas issued a report on Goldson's death on December 11, 2014. (Doc. 77-6 at PageID 3194–3199.) The Grand Jury "concluded that Zachary Goldson committed suicide on October 5, 2013." (*Id.* at PageID 3199.) The Grand Jury did not issue any indictments for Goldson's death.

In opposition to the findings of BCI and the Grand Jury, Plaintiff submits evidence suggesting that Goldson could not physically have tied the bed sheet around the sprinkler assembly and hung himself. First, Goldson's fingerprint record indicates that Goldson's left middle finger was physically impaired such that he could not exert enough pressure with that finger to make even a full fingerprint. (Doc. 97-3 at PageID 3949–3950.) Second, trusty inmate Downing stated in an Affidavit dated June 12, 2018, that he was unable to tie a sheet around the sprinkler head escutcheon. (Doc. 97-10 at PageID 4182–4183.) He averred as follows:

> 22. I thought it sounded fishy the way they claimed Zach [Goldson] hanged himself. When I was cleaning out the [holding cell 15] I wanted to try to see if I could do what they said Zach did.
>
> 23. I am six feet one inch in height. The same height as Zach[.]
>
> 24. I stood on the sink and reach[ed] out to the sprinkler. There was no way I could tie a knot with my weight leaning forward. I couldn't do it with both hands freed. I had to use one hand to balance myself.
>
> 25. I was wearing regular shoes. People in medical and on suicide watch can only have sandals. It was my understanding from the security video that Zach's shoes were tossed out of his cell so either he had sandals or was barefoot.
>
> 26. I could not stand on the sink, lean over and reach the sprinkler head and tie a knot and I was wearing shoes and using both hands. Doing it barefoot or without shoes would have been even harder.

(*Id.*)[8]

Second, Plaintiff relies on an expert report prepared by Scott G. Roder, the owner and head of a forensic animation and demonstrative evidence consulting firm. (Doc. 92-1 at PageID 3888–3902.) Roder stated that he has been qualified as an expert in the field of forensic animation, has provided testimony and analysis on the reconstruction of shooting incidents in more than fifty cases, and has served as a crime scene science consultant for CBS News. (*Id.* at PageID 3889.) In this case, Roder created a replica of holding cell 15 to scale using the cell measurements and photographs, and including replicas of the bed, sink, toilet, light fixtures, and sprinkler assembly. (*Id.* at PageID 3898.) He then conducted numerous experiments to determine if Goldson could have tied knots into the bedsheet, secured the bedsheet around the sprinkler escutcheon plate in the ceiling, and hung himself. For example, he videotaped a twenty-four-year-old, 6'0", 170-pound male with a 6'4" wingspan as he tied a knot around his neck, climbed onto the toilet and then to the attached sink, reached for the sprinkler assembly, and then tried to tie a bedsheet in the gap between the sprinkler escutcheon and the ceiling. The test subject was not able to safely reach the sprinkler with two hands, but rather he had to place one hand on the wall to avoid falling. The test subject was not able to secure a pre-tied knot around the sprinkler escutcheon using one hand when he used the other hand to support himself. (*Id.* at PageID 3898–3900 at https://www.dropbox.com/s/knpzpqwo2zucj1j/No%2520Handcuffs.mp4?dl=0.)

Roder offered the following opinions:

> 1. After testing of the bed sheets provided by the defense in this matter for testing, it is my opinion that it is highly unlikely or even impossible under

---

[8] The Court notes that Downing made contradictory statements on this same issue when he was interviewed by the BCI in October 2013, shortly after Goldson's death. Downing told BCI Special Agent Hornyak in December 2013 that he went into the holding cell in which Goldson died, stepped on the toilet seat and the sink, reached the sprinkler head "pretty easily," and could have tied a sheet around it. (Doc. 104, Ex. C 0:01 to 1:38.)

certain circumstances, that this sheet, after being twisted into a ligature for a neck hanging could be weaved under the escutcheon, sprinkler head assembly without a minimum of a +1/2 inch gap.

2. A normal human man does not posses[s] the finger strength to lower the escutcheon, sprinkler head assembly with one hand while balancing precariously on a sink. This task is IMPOSSIBLE.

3. Many attempts would have had to been made over a substantial amount of time to successfully create two prefabricated knots in the bed sheet to allow for a hanging where the subjects feet would not touch the ground and the knots would not become loose or fall from the escutcheon, sprinkler head assembly. While standing on a ladder with ideal conditions, this is a challenging task and several attempts were made before we were able to replicate the conditions Mr. Goldson was allegedly discovered.

4. If Mr. Goldson was, in fact, discovered hanging by the neck from the escutcheon, sprinkler head assembly as alleged by the defense, then it is grossly negligent that Mr. Goldson was not photographed in said position. The ONLY possible reason for cutting Mr. Goldson down, without proper documentation would be to provide emergency medical attention. Which did NOT happen in this instance.

5. After extensive research as described above, it is [my opinion] to a reasonable degree of scientific certainty that Zackary [*sic*] Goldson could NOT have hanged himself in the jail cell environment, unassisted.

(*Id.* at PageID 3901–3902.)

## B.    Procedural Posture

Plaintiff Bard, the sister of Goldson, initiated this suit individually and as the administrator of his estate on October 2, 2015. (Doc. 1.) Three days later she filed an Amended Complaint. (Doc. 2.) Defendants are Brown County, Ohio, and Sheriff Wenninger, Deputy Wedmore, Corporal Meyer, Corporal Huff, CO Dunning, CO McKinzie, and CO Schadle, in their individual and official capacities. (Doc. 2 at PageID 32–33.) Plaintiff asserts six claims for relief:

(1) Violations of rights under the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983;

(2) Negligence;

(3) Assault and battery;

(4) Wrongful death;

(5) Spoliation; and

(6) Intentional infliction of emotional distress.

(*Id.* at 33–44.)

After more than two years of discovery, Defendants timely filed their Motion for Summary Judgment and Statement of Proposed Undisputed Facts on March 15, 2018. (Docs. 77, 77-1.) Plaintiff moved for and received two extensions of time to file her opposition brief. (Docs. 83, 89.) Plaintiff ultimately had two and one-half months to respond. Plaintiff, through her attorneys, filed an initial Memorandum in Opposition on May 28, 2018. (Doc. 91.) However, she failed to file a Response to Defendant's Statement of Proposed Undisputed Facts as required by this Court's Standing Order on Civil Procedures, and she made numerous procedural errors in filing and citing to evidence opposing summary judgment. Accordingly, the Court issued an MSJ Scheduling Order striking Plaintiff's Memorandum in Opposition and setting a new schedule for Plaintiff to correctly file her exhibits and opposition brief. (Doc. 95 at PageID 3910–3911.) Thereafter, Plaintiff filed a corrected Memorandum in Opposition to Summary Judgment and a Response to Proposed Undisputed Facts. (Docs. 102, 102-2.) Defendants timely filed their Reply brief. (Doc. 108.)

Defendants also filed Objections Pursuant to Fed. R. Civ. P. 56(c)(2) to several exhibits filed by Plaintiff to support the corrected Memorandum in Opposition to Summary Judgment. (Doc. 103.) Defendants filed an Affidavit of David Hornyak, Ohio BCI special agent, to support arguments made within the Objections. (Doc. 104.) Plaintiff did not file any response to the

Objections.  On December 31, 2018, the Court issued an Order Sustaining in Part and Overruling in Part the Objections (Doc. 114).

The Court then held oral argument on the Motion for Summary Judgment on January 28, 2019.

## II.     STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden to show that no genuine issues of material fact are in dispute.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).  The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*).  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."

*Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## III.   ANALYSIS

The Court will analyze whether Defendants are entitled to summary judgment on the constitutional claims, and then turn its focus to the state law claims.

### A.   Constitutional Claims Against Defendants Dunning, Huff, McKinzie, Meyer, Schadle and Wedmore

Plaintiff asserts that Goldson's constitutional rights were violated both at the hospital and back at the Brown County jail in the early morning hours of October 5, 2013. 42 U.S.C. § 1983 provides a cause of action to a plaintiff who is deprived of constitutional rights by a person acting under the color of state law. Plaintiff asserts claims for excessive force/failure to intervene and for deliberate indifference. Claims for excessive force against a pretrial detainee and for deliberate indifference to the serious medical needs of a pretrial detainee both arise under the Due Process Clause of the Fourteenth Amendment. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); *Brown v. Chapman*, 814 F.3d 447, 465 (6th Cir. 2016) (deliberate indifference); *Coley v. Lucas Cnty., Ohio*, 799 F.3d 530, 538 (6th Cir. 2015) (excessive force). Defendants move for summary judgment arguing both that they did not violate Goldson's constitutional rights and that they are entitled to qualified immunity.

The doctrine of qualified immunity provides "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity provides immunity from suit, not simply a defense to liability. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine whether qualified immunity applies, courts must ask whether the government official's conduct violated a constitutional right, and if yes, whether the specific right violated was clearly established. *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson*, 555 U.S. at 232. A defendant is entitled to qualified immunity if his conduct violated a constitutional right, but that right was not clearly established at the time of the violation. *Saucier*, 533 U.S. at 200–01. The inquiry into whether the constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. Courts can examine either issue first. *Pearson*, 555 U.S. at 236. "Each defendant's liability must be assessed individually, based on his or her own actions." *Dorsey v. Barber,* 517 F.3d 389, 399 n. 4 (6th Cir. 2008).

### 1. Events at the Hospital

The Court first will examine the events at the hospital after Goldson had escaped from his restraints and assaulted Deputy Justice. Of the individual Defendants, only Corporal Meyer and Deputy Wedmore were present at the scene. However, it important to note that Goldson already had been subdued before Corporal Meyer and Deputy Wedmore arrived at the hospital. Neither Corporal Meyer nor Deputy Wedmore directly participated in holding Goldson on the ground, handcuffing his arms behind his back, or re-securing his leg shackles. As such, they cannot be held liable for personally using excessive force. Corporal Meyer actively helped escort Goldson to Deputy Wedmore's cruiser, but that was not done with excessive force. Deputy Wedmore directed an angry stream of obscenities at Goldson, but verbal threats and obscenities do not rise

to the level of a constitutional violation. *See Marcilis v. Twp. of Redford*, 693 F.3d 589, 599 (6th Cir. 2012) (finding that verbal threat of violence was not excessive force); *Nuchols v. Berrong*, 268 F. App'x 414, 415, 418 (6th Cir. 2008) ("[A] one-time, exaggerated threat of harm made in a moment of anger does not rise to the level of a constitutional violation."); *Miller v. Wertanen*, 109 F. App'x 64, 65 (6th Cir. 2004) (finding that threat of sexual assault did not violate constitutional rights).

Instead, Plaintiff's theory of liability appears to be that the Georgetown police officers used excessive force, and Corporal Meyer and Deputy Wedmore should be held liable for failure to intervene. "A police officer may be held liable for failure to intervene during the application of excessive force when: (1) the officer observed or had reason to know that excessive force would be or was being used; and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Kulpa v. Cantea*, 708 F. App'x 846, 854 (6th Cir. 2017) (internal quotation and citation omitted).

The test for whether excessive force has been used against a pretrial detainee requires the plaintiff to show "that the force purposely or knowingly used against him was objectively unreasonable." *Coley*, 799 F.3d at 538 (quoting *Kingsley v. Hendrickson,* ––– U.S. –––, 135 S. Ct. 2466, 2473 (2015)). Considerations bearing on the reasonableness of the force used include the following:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* (quoting *Kingsley*, 135 S. Ct. at 2473). "[P]retrial detainees (unlike convicted prisoners) cannot be punished at all, much less maliciously and sadistically." *Kingsley*, 135 S. Ct. at 2475 (internal quotation and citation omitted).

Plaintiff appears to be arguing that the Georgetown police officers used excessive force when they held Goldson's handcuffed arms up above his shoulder blades for approximately one minute and placed a knee on Goldson's back for approximately two minutes as he was lying on his stomach on the ground. "Typically, when an officer seeks to restrain a person suspected of a violent crime, the officer may justifiably use substantial force." *Kulpa*, 708 F. App'x at 851. However, it is clear that "putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004). After *Champion*, it is clearly established that "a suspect had the right to be free from being forcibly kneed in the back while not actively resisting arrest and lying on his stomach on the ground not resisting arrest." *Sweatt v. Doxtader*, 986 F. Supp. 2d 886, 898 (E.D. Mich. 2013).

The facts here are distinguishable from those in *Champion*. The mentally disabled plaintiff in *Champion* not only had force applied to her back, she also was pepper sprayed after being "immobilized by handcuffs and a hobbling device." 380 F.3d at 903. Goldson is not a mentally disabled person, and he was not pepper sprayed. The officers held him on the ground for only approximately two minutes. Plaintiff has not offered evidence sufficient to prove that the officer put substantial or significant pressure on Goldson's back or created asphyxiating conditions. Goldson did dry heave, but that was immediately after he had engaged in a physical struggle with several officers and hospital personnel. He then was able to catch his breath while he was still restrained on his stomach. Moreover, Goldson was restrained only in handcuffs the

majority of the time an officer kept his knee on Goldson's back. The officers were justified in using some force to hold Goldson to the ground to make sure he did not attempt to escape again. Finally, the officers lifted Goldson off the ground within approximately fifteen seconds after the leg shackles were re-secured. The Georgetown police officers acted reasonably by using force to hold Goldson to the ground given that Goldson had just escaped his restraints and assaulted Deputy Justice.

Moreover, even if the Georgetown police officers had used excessive force, the Court cannot conclude that Corporal Meyer or Deputy Wedmore had an opportunity and means to intervene as required by the second prong of the *Kulpa* test. Corporal Meyer arrived at the scene just as the Georgetown police officers were handcuffing Goldson. He noticed that Goldson had freed one of his legs from the shackles Deputy Justice had put on him, so he returned to his cruiser to get a second set of shackles. When he returned to the area where Goldson was being held to the ground, Goldson's handcuffed arms already had been lowered down towards his back. He watched as Goldson's legs were re-secured in the shackles, and within fifteen seconds, he participated in lifting Goldson from the ground and bringing him to the cruiser. "[T]here is no duty to intervene where one officer's act of excessive force [if any] occurs so rapidly that a second officer on the scene lacks a realistic opportunity to intervene and prevent harm." *Barton v. City of Lincoln Park*, 726 F. App'x 361, 366 (6th Cir. 2018) (internal quotation and citation omitted).

As for Deputy Wedmore, he arrived at the hospital after Goldson had made the dry-heaving or regurgitation noises. The Georgetown police officers were lowering Goldson's handcuffed arms from the air over his shoulder blades and towards his back as Deputy Wedmore walked up the hill towards Goldson. There is no indication that Goldson was in physical distress

by the time that Deputy Wedmore arrived. The Court concludes that neither Corporal Meyer nor Deputy Wedmore violated Goldson's constitutional rights at the hospital, and accordingly, they are entitled to qualified immunity for their actions at the hospital.

### 2.    Events at the Brown County Jail

#### a.    Goldson's Removal from the Sheriff's Cruiser

Plaintiff first complains about the rough manner by which Corporal Huff removed Goldson from Deputy Wedmore's cruiser in the sally port at the jail. Goldson was lying down on his stomach in leg shackles and handcuffs in the back seat of the cruiser. Corporal Huff pulled Goldson out of the cruiser by his leg shackles causing his upper body to fall to the floor. Plaintiff contends that Corporal Huff is liable for excessive force and that Deputy Wedmore, CO Dunning, and CO Schadle are liable for failure to intervene for this incident.

 Corporal Huff testified that he removed Goldson from the car by his leg shackles because he wanted to act quickly to prevent Goldson from attempting to escape again. The Court cannot determine from the video evidence on what part of his upper body Goldson landed, but the paramedic who responded to the scene after Goldson was found dead in his cell and the coroner who performed the autopsy found only minor abrasions to his cheek or nose. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" violates the Constitution. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation omitted). The concept of reasonableness must include recognition that officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* More recently, the Supreme Court recognized that "running a prison is an inordinately difficult undertaking" and that "safety and order at these institutions requires the expertise of correctional officials, who must have

24

substantial discretion to devise reasonable solutions to the problems they face." *Kingsley*, 135 S. Ct. at 2474.

Corporal Huff moved quickly and with force to secure an inmate who minutes earlier had escaped restraints and attacked an officer. Plaintiff has not established that Corporal Huff used objectively unreasonable force. It follows that Deputy Wedmore, CO Dunning, and CO Schadle cannot be held liable for failure to intervene to prevent the use of excessive force. Additionally, Corporal Huff was closest to the rear door of the cruiser, and he removed Goldson from the cruiser so quickly that the other officers would not have had the opportunity to intervene even if intervention had been required. For these reasons, the officers have qualified immunity for the manner by which Goldson was removed from the cruiser.

### b.    Goldson's Placement in the Holding Cell and Death

Plaintiff, through her attorneys, did not in her Memorandum in Opposition clearly articulate a theory of liability against the individual Defendant officers based on the events from the time Goldson was taken to holding cell 15 through the time CO Schadle started to administer CPR. Plaintiff asserted that Goldson was handcuffed, shackled, and hogtied in holding cell 15. She further asserted that Goldson's hanging was "staged" and that he could not physically have tied the bed sheet around the sprinkler assembly in the ceiling and hung himself. (Doc. 102 at PageID 4247, 4263, 4267.)

To begin, Plaintiff does establish a question of fact as to whether Goldson physically could have hung himself in holding cell 15 by tying a sheet around the sprinkler assembly. On one side, the officers testified that they found Goldson hanging, the hallway video showed that no one entered Goldson's cell between the time he was locked in the cell around 2:34 a.m. and

the time CO Schadle discovered him at 2:58 a.m., the BCI investigator determined that Goldson was able to hang himself, and the grand jury determined that Goldson committed suicide.

On the other side, Plaintiff's expert, Scott Roder, was unable to physically duplicate the acts required for a person to hang himself from the sprinkler assembly in a to-scale reproduction of holding cell 15. Physical barriers included the height of the sprinkler assembly in the ceiling, the distance between the sink upon which an inmate could stand and the sprinkler assembly, and the difficulty of tying a bed sheet in the narrow gap between the sprinkler escutcheon plate and the ceiling. Trusty inmate Downing also stated in his June 2018 Affidavit that he could not tie a sheet around the sprinkler head escutcheon in holding cell 15 when he tried to recreate the act. Finally, Goldson's fingerprint record indicates that Goldson's left middle finger was physically impaired which could have made the act of tying a sheet around the sprinkler head escutcheon more difficult.

Nonetheless, it is not sufficient at the summary judgment stage for Plaintiff to establish a disputed question of fact as to whether Goldson could have committed suicide by hanging himself. Plaintiff had more than two years in this case to obtain discovery and marshal facts establishing an alternative theory of how Goldson died. However, Plaintiff has not put forth admissible evidence establishing *who caused* Goldson's death and *when* if he did not commit suicide. Plaintiff has the burden at the summary judgment stage to provide evidence that individual Defendants violated Goldson's clearly established constitutional rights by specific acts or failures to act. Plaintiff does not have evidence sufficient to establish that any Defendant used excessive force or failed to intervene to prevent the use of excessive force against Goldson, much less that any specific Defendant caused Goldson's death. Therefore, Defendants are entitled to qualified immunity and summary judgment.

Plaintiff's assertions in the Memorandum in Opposition that Goldson was placed in leg shackles, handcuffs, and a neck restraint when he was in holding cell 15 do not amount to a constitutional violation claim. To begin, Plaintiff lacks evidence to support the assertion that the officers left Goldson in the leg shackles after he was placed in the holding cell. CO Dunning and CO Huff both testified that the leg shackles were taken off of Goldson, and CO Dunning specifically testified that the leg shackles were removed from the cell. CO McKinzie made inconsistent statements about whether she bagged the leg shackles for evidence, but she stated clearly to the BCI that she saw the officers remove the leg shackles from holding cell 15 before locking Goldson in the cell.

Plaintiff is left to argue that the officers testified falsely about removing the leg shackles. She offers no affirmative evidence to support this assertion, but instead points out that no officer is clearly seen in the hallway video removing the leg shackles from the cell when Goldson is returned from the hospital. However, Plaintiff has not alleged that Goldson was in leg shackles when the paramedics arrived. At some point the shackles had to have been removed from the cell whether or not they are clearly visible in the blurry Goldson Placement in Cell hallway video. Plaintiff has not met her burden to provide sufficient evidence for a reasonable jury to conclude that Goldson was restrained in leg shackles when he died.

As to the handcuffs, Plaintiff asserts that CO Schadle and CO Dunning removed the cuffs the Georgetown police officer had placed on Goldson at the hospital, but then re-cuffed Goldson with handcuffs carried by CO Schadle. Plaintiff offers no witness testimony to directly support this assertion. Instead, Plaintiff points to video evidence that her attorneys interpret to show CO Schadle carrying handcuffs in a belt pouch when he was escorting Goldson from the sally port

into the jail, but not carrying handcuffs a few minutes later after he locked Goldson in holding cell 15.[9]

The Court has examined the Sallyport Video 10-5-13 and the Goldson Placement in Cell video. (Doc. 98-1.) CO Schadle does appear to have something in his belt pouch in the sally port, but the Court cannot determine what it is from the video. (*Id.*, Sallyport Video 10-5-13 at 00:11 to 00:13.) The item seen in CO Schadle's belt pouch in the sally port is no longer visible when he exits holding cell 15, but the Court cannot draw any firm conclusions from the dark and blurry video footage. (*Id.*, Goldson Placement in the Cell at 1:00 to 1:06.) Even if the Court were to assume that CO Schadle was carrying handcuffs in his pouch in the sally port, but that the handcuffs were no longer in the pouch when he left the holding cell, a reasonable jury could not on that shaky foundation alone conclude that the officers re-cuffed Goldson in the holding cell. It is equally as plausible that the handcuffs slid deeper into the pouch, that CO Schadle transferred the handcuffs to his pocket, or that CO Schadle left the handcuffs in the intake room before he entered holding cell 15 with Goldson. Plaintiff, through her attorney, deposed CO Schadle in February 2018, but the attorney did not solicit evidence on this issue. Plaintiff has not met her burden of establishing a genuine dispute of material fact exists on this point.

Finally, Plaintiff lacks sufficient evidence for a reasonable jury to conclude that the officers violated Goldson's rights by restraining him in a hobble strap or dog leash-type ligature around his neck, a theory emphasized by Plaintiff's attorney at the oral argument. Plaintiff relies in part on trusty inmate Downing Affidavit statement that Goldson was hogtied before he was

---

[9] To be clear, Plaintiff has not identified any witness who will testify that the object seen in CO Schadle's pouch in the video was handcuffs. Trusty inmate Downing stated in his 2018 Affidavit that CO Schadle "always" carried handcuffs in a cuff pouch on his right side, but he did not specifically state whether CO Schadle was carrying handcuffs on the night that Goldson died. (Doc. 97-10 at PageID 4183.) CO Schadle testified at his deposition that he sometimes carried handcuffs at the jail, but he carried them either looped in his belt or in a pocket. (Doc. 76-1 at PageID 3009, 3012.) He was not asked whether he carried handcuffs on the night Goldson died.

placed in the cell. That statement, however, is refuted by the stipulated video evidence showing that Goldson was wearing only handcuffs and leg shackles when he was placed in the cell. (Doc. 98-1, Goldson Placement in Cell.) No other eyewitness testified any officer was carrying a hobble strap or ligature the night that Goldson died, nor that any officer placed such a hobble strap or ligature around Goldson's neck. No witness testified that a hobble strap or ligature was found on Goldson's body or anywhere in the holding cell. There is no hobble strap or ligature visible in the blurry video footage before or after Goldson's death.

When asked at oral argument what witnesses would support the hobble strap theory, Plaintiff's attorney responded that Dr. Varnau, then the Brown County Coroner, and her unpaid investigator, Donald Newman, would testify at trial that Goldson must have had a hobble strap or ligature around his neck. The Court already held in the December 31, 2018 Order that Donald Newman's testimony on this point is inadmissible because he lacked first-hand knowledge of the facts and was not identified as an expert witness. (Doc. 114 at PageID 4632.) As for Dr. Varnau, she testified that she thought the marks visible on Goldson's neck in the autopsy photos were more likely caused by a hobble strap or leash than by a bed sheet. (Doc. 74-15 at PageID 1511, 1686.) Her opinion, however, was based at least in part on Newman's inadmissible opinion. (*Id.* at PageID 1511.)

Moreover, Dr. Varnau's limited testimony on this point has to be considered in the context of her entire deposition testimony. She plainly stated during her testimony that she did not know how Goldson died. (*Id.* at PageID 1729.) She stated that she did not believe Goldson hung himself, but she stated further "What happened, I do not know" and "They [the officers] need to tell us." (*Id.*) Dr. Varnau, nonetheless, offered inconsistent theories of how he died. She

stated that at one point that that hanging was staged, but at another point that a guard might have asked an inmate to hang Goldson.  (*Id.* at 1729, 1745.)

Additionally, Dr. Varnau's testimony does not connect the dots between her assumption that a hobble strap was placed around Goldson's neck and his death.  Dr. Varnau issued a supplementary certificate of death stating the cause of death was "strangulation" and "homicide," but that is not the same as offering evidence to prove that any particular Defendant officer used excessive force against Goldson.[10]  To the extent that Plaintiff's attorney appeared to suggest at oral argument that Goldson might have died by accidental self-strangulation because he struggled against the self-tightening hobble strap or ligature around his neck, Dr. Varnau's testimony does not reasonably support that theory.  Again, she stated explicitly that she did not know how Goldson died.  Moreover, Dr. Varnau did not testify—nor could she testify since she was not present at the jail—as to which officer purportedly placed the never-seen hobble strap or ligature around Goldson's neck.

The Court is left with the implicit argument that an unspecified officer or officers, at an unspecified time, must have placed the hobble strap or ligature around Goldson's neck, and/or strangled him with it, and then staged the hanging.  However, a *res ipsa loquitor*-type theory is not a basis for imposing liability under § 1983.  *See Clark-Murphy v. Foreback*, 439 F.3d 280,

---

[10]  Ohio Revised Code states that a county coroner's determination as to the cause, manner, and mode of death "shall be the legally accepted manner and mode in which such death occurred, and the legally accepted cause of death, unless the court of common pleas of the county in which the death occurred, after a hearing, directs the coroner to change his decision as to such cause and manner and mode of death."  Ohio Rev. Code § 313.19.  The statute is interpreted to mean that the coroner's determination creates a "non-binding, rebuttable presumption concerning such facts in the absence of competent, credible evidence to the contrary."  *Vargo v. Travelers Ins. Co.*, 34 Ohio St. 3d 27, 516 N.E.2d 226, 229 (1987).  "[T]he statute does not compel the fact-finder to accept, as a matter of law, the coroner's factual findings concerning the manner, mode, and cause of decedent's death."  *McFarren v. Canton*, 59 N.E.3d 652, 670 (Ohio App. 2016).  In this case, Dr. Varnau's determination that the cause of death was strangulation is countered by the determinations of the forensic pathologists from Montgomery County that the cause of death was hanging, not strangulation.  This is a material fact in dispute, but it is not dispositive to the Motion for Summary Judgment.

286 (6th Cir. 2006) (stating that *res ipsa loquitor* cannot support a claim for deliberate indifference); *Coleman v. Parra*, 163 F. Supp. 2d 876, 888 (S.D. Ohio 2000) (stating that a *res ipsa loquitor* theory is not sufficient to survive summary judgment on a § 1983 claim where the individual defendant must act knowingly or intentionally).[11]  A plaintiff must prove that each individual defendant is liable for a constitutional violation pursuant to § 1983 based on his or her own actions.  *Dorsey*, 517 F.3d at 399 n.4.

The Defendant officers cannot be held liable simply because they took Goldson to his holding cell and/or were present at the jail when he died.  Plaintiff has not marshalled facts indicating that Deputy Wedmore, Corporal Huff, CO Dunning, CO McKinzie, or CO Schadle

---

[11]  *See also Curtis v. Hinds Cnty., Miss.*, No. 3:12CV260LRA, 2014 WL 4773973, at *3 (S.D. Miss. Sept. 24, 2014) (stating that *res ipsa loquitor* has no place in a § 1983 action and that the plaintiff must specifically identify the act that caused his injury); *Dasenbrock v. Kings Cnty.*, No. 1:11-cv-01884-DLB PC, 2012 WL 5364644, at *2 (E.D. Cal. Oct. 31, 2012) (stating *that res ipsa loquitur* is a negligence theory and cannot support a deliberate indifference claim pursuant to § 1983); *Hunt ex rel. Chiovari v. Dart*, 754 F. Supp. 2d 962, 977 (N.D. Ill. 2010) (stating that *res ipsa loquitor* applies only in negligence cases).

The case of *Williams v. Detroit Public Schools*, No. 10-11797, 2012 WL 3466987, at *3 (E.D. Mich. Aug. 15, 2012), is instructive.  The district court granted summary judgment to the individual defendants when there was a lack of evidence as to which defendant committed the tortious act:

> There is very little evidence in the record in this case.  The only evidence before the Court are plaintiff K.C.'s answers to interrogatories and requests to admit, which, if taken as true, demonstrates that a male, uniformed officer who was part of a group of three officers sprayed the plaintiff with pepper spray on May 1, 2007 and the plaintiff suffered an asthma attack and pain as a result.  Accepting all of that as true, there is no evidence that would permit a reasonable jury to find for the plaintiff and against the defendants.  Although the evidence would permit the jury to find that some uniformed officer sprayed the plaintiff, there is no evidence that any of the individual defendants sprayed the plaintiff with pepper spray, supervised an individual who sprayed the plaintiff with pepper spray, observed the plaintiff being sprayed with pepper spray, or had the opportunity and means to prevent someone from spraying the plaintiff with pepper spray.  Indeed, there is no evidence that would demonstrate that the defendant officers were attached to the DPS public safety department or even at the protest on May 1, 2007.  Whether or not plaintiff's counsel's statement in the motion to compel constitutes an admission is beside the point.  The plaintiff has utterly failed to present any evidence tying any of the defendants to the pepper spray incident.

*Id.* at *3; *see also Corley v. Shahid*, 89 F. Supp. 3d 518, 524 (E.D.N.Y. 2015) (granting a directed verdict in favor of defendant officers when the plaintiff's failure to produce evidence required that the "jury would have had to guess which defendants to hold liable").  Likewise, here, Plaintiff has not tied any Defendant officer to Goldson's strangulation or hanging death.

participated in or failed to intervene against the use of excessive force against Goldson. Plaintiff has not established, and the video evidence does not demonstrate, that any officer re-entered the holding cell after Goldson was locked inside at 2:34 a.m. until he was found dead. Plaintiff has not even established that Deputy Wedmore and Corporal Huff—both of whom testified that they returned to the hospital to check on Deputy Justice—were even at the jail when Goldson died.

For all of these reasons, Deputy Wedmore, Corporal Huff, CO Dunning, CO McKinzie, and CO Schadle are entitled to qualified immunity as to the claims against them based on the death of Goldson in the holding cell.

### c.        Deliberate Indifference to Medical Needs

Plaintiff also argues that Defendants are liable for deliberate indifference to Goldson's medical needs based on the manner in which and length of time they rendered CPR to Goldson.[12] (Doc. 102 at 4269–4272.) Deputy Wedmore and Corporal Meyer were not on site at the jail when Goldson was discovered hanging in the holding cell, and therefore they cannot be held liable for deliberate indifference.

As stated earlier, a cause of action for deliberate indifference to the serious medical needs of a pretrial detainee arises under the Due Process Clause of the Fourteenth Amendment. *See City of Revere*, 463 U.S. at 244; *Brown*, 814 F.3d at 465. Mere negligence is not sufficient to support a claim for deliberate indifference to serious medical needs. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "A claim for deliberate indifference to serious medical needs has both objective and subjective components." *Scozzari v. Miedzianowski*, 454 F. App'x 455, 464 (6th

---

[12]  Plaintiff alleged in the Amended Complaint that Defendants failed to provide adequate medical care to Goldson after he twice caused himself injury by swallowing items and by failing to provide adequate supervision while he was at risk.  (Doc. 2 at PageID 35–37.)  The Court considers the claim abandoned to the extent it was based on those interrelated theories because Plaintiff failed to address those issues in her brief. *See Hicks v. Concorde Career Coll.* 449 F. App'x 484, 487 (6th Cir. 2011); *Clark v. City of Dublin, Ohio*, 178 F. App'x 522, 524–25 (6th Cir. 2006).

Cir. 2012). The objective component requires proof of a "sufficiently serious" medical need, while the subjective component requires showing that the defendant "perceived facts from which to infer substantial risk to the [individual], that he did in fact draw the inference, and that he then disregarded that risk." *Id.* (citations omitted). Also, ordinarily, "proximate causation is an essential element of a § 1983 claim for damages." *Jackson v. Gibson*, No. 1:16-cv-993, 2018 WL 4566247, at *2 (S.D. Ohio Sept. 24, 2018) (citing *Horn v. Madison Cnty.*, 22 F.3d 653, 659 (6th Cir. 1994)), *appeal filed*, No. 18-3982 (6th Cir. Oct. 12, 2018).

CO Schadle, with the assistance of CO McKinzie and CO Dunning, rendered immediate medical assistance to Goldson. The evidence is undisputed that CO Schadle administered CPR and CO McKinzie called for the life squad. Nonetheless, Plaintiff objects that the corrections officers rendered inadequate medical assistance. She contends that the officers should have removed the bed sheet from around Goldson's neck, should not have cuffed Goldson's hands behind his back before starting CPR, and should not have ceased CPR at the direction of Corporal Huff before the life squad arrived. When a plaintiff alleges that he received inadequate care, and as opposed to no care, "federal courts are generally reluctant to second guess medical judgments" unless the medical treatment is "so woefully inadequate as to amount to no treatment at all." *Asplaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011). A plaintiff must provide verifying medical evidence when a claim is based on "the prison's failure to treat a condition adequately." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 898 (6th Cir. 2004); *see also Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (stating that medical proof was needed to prove that the delay in providing a specific type of medical treatment caused a medical injury).

Plaintiff's claim is based on the adequacy of the care the officers provided. However, she does not provide medical evidence from an expert witness to support the claim. She insinuates

that the fact that Goldson's hands were cuffed behind his back might have impeded the effectiveness of the CPR, but the Court cannot make that assumption in the absence of medical proof. Likewise, the Court cannot assume that the sheet tied around Goldson's neck impeded the CPR efforts. The Court does not know whether and will not assume that the sheet restricted Goldson's airway after he was cut down and placed on the floor. Likewise, the Court cannot determine without medical proof that the limited length of time during which CO Schadle administered CPR was the proximate cause of Goldson's death. Stated differently, in the circumstances of this case, the Court cannot determine without expert medical testimony that Goldson would have lived, or would have been resuscitated, if the bedsheet and cuffs had been removed and if CPR had been administered until the paramedics arrived.

Moreover, the Court cannot find that the officers violated clearly established law in the manner by which or length of time they administered CPR. The officers arguably satisfied their duty to provide medical care to Goldson when they immediately called for a life squad regardless of how long CO Schadle administered CPR. The Sixth Circuit stated in 1992 that "[w]e have found no authority suggesting that the due process clause establishes an affirmative duty on the part of police officers to render CPR in any and all circumstances." *Rich v. City of Mayfield Hts.*, 955 F.2d 1092, 1097 (6th Cir. 1992) (citation omitted). The officer in *Rich* found Daniel Walczak, a pretrial detainee, hanging by his neck from a sock tied to the hinge of the jail cell door. The officer immediately called for medical assistance, but he did not cut down Walczak or render medical aid himself before the paramedics arrived one minute after being called. *Id.* at 1093–1094. The court found that the officers had not violated Walczak's constitutional rights because they immediately summoned medical care for him. *Id.* at 1097–1098.

*Rich* has been cited for the principle that officers are not deliberately indifferent to medical needs if they immediately summon emergency medical providers, even when they do not render medical care themselves. *See*, *e.g.*, *May v. Twp. of Bloomfield*, No. 11-14453, 2013 WL 2319323, at *15 (E.D. Mich. May 28, 2013) (applying *Rich* and finding against plaintiff who argued that officers should have provided CPR); *Ables v. Shelby Cnty., Tenn.*, No. 2:10-cv-02169-JPM-dkv, 2010 WL 3024959, at *4 (W.D. Tenn. July 29, 2010) ("No case has been brought to the Court's attention which has found that a police officer must do more than promptly summon medical help when confronted with a pretrial detainee in need of medical assistance."). The principle in *Rich* was re-affirmed in 2018 when the Sixth Circuit stated that "[w]hen police injure a person while apprehending him, they generally satisfy the Fourteenth Amendment by summoning medical care and not intentionally or recklessly delaying his access to it." *Wilkerson v. City of Akron, Ohio*, 906 F.3d 477, 483 (6th Cir. 2018).

Finally, the case cited by Plaintiff, *Heflin v. Stewart County, Tennessee*, 958 F.2d 709 (6th Cir. 1992), does not require a different result. The officers in *Heflin* left an inmate hanging for more than twenty minutes and never administered CPR, though they did summon medical help. *Id.* at 711–12. The court found that the officers were not entitled to qualified immunity because "[t]he unlawfulness of doing nothing to attempt to save Heflin's life would have been apparent to a reasonable official." *Id.* at 717. The facts here are distinguishable. Defendants cut down Goldson and administered CPR, in addition to calling for emergency medical services. They are entitled to qualified immunity and cannot be held liable for deliberate indifference under the facts of this case.

**B.    Constitutional Claims against Defendants Brown County and Sheriff Wenninger**

A supervisor cannot be held liable pursuant to § 1983 solely on the basis of respondeat superior. *Petty v. Cnty. of Franklin, Ohio*, 478 F.3d 341, 349 (6th Cir. 2007). A supervisor is only liable if he encouraged, participated in, authorized, approved, or knowingly acquiesced in the unconstitutional conduct of his subordinates. *Petty*, 478 F.3d at 349; *Taylor v. Mich. Dep't of Corrections*, 69 F.3d 76, 81 (1995). Plaintiff has not articulated a theory of liability or submitted any evidence against Sheriff Wenninger. Sheriff Wenninger had no personal involvement or interaction with Goldson on the night he died. Accordingly, Sheriff Wenninger has qualified immunity and is entitled to summary judgment on the constitutional claims against him.

A municipality or township is "liable under § 1983 only where the [government entity] itself causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). A plaintiff seeking to subject a township to § 1983 liability for the actions of its officers must "identify a [governmental] 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). The Sixth Circuit has recognized at least four avenues by which to prove a municipality's policy or custom:

> (1) the municipality's legislative enactments or official agency policies;
> (2) actions taken by officials with final decision-making authority; (3) a policy
> of inadequate training or supervision; or (4) a custom of tolerance or
> acquiescence of federal rights violations.

*Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015); *see also Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2004) (same). Plaintiff has proven neither a constitutional violation nor that Brown County has a policy causing constitutional injury. The Court will grant summary judgment to Brown County on the constitutional claims.

**C.     State Law Claims for Negligence, Assault and Battery, and Wrongful Death Against All Defendants**

Plaintiff asserts pendent, state law claims for negligence, assault and battery, and wrongful death.  (Doc. 2 at PageID 37–41, 43–44.)  Defendants move for summary judgment on these claims on the basis of Ohio Revised Code §§ 2744.02 and 2744.03.

Starting with the claims against Brown County, Ohio Revised Code Chapter 2744 "requires a three-tiered analysis to determine whether a political subdivision should be allocated immunity from civil liability."  *Hubbard v. Canton City Sch. Bd. of Educ.*, 97 Ohio St. 3d 451, 780 N.E.2d 543, 546 ¶ 10 (2002).  The first tier recognizes the general rule stated in Ohio Revised Code § 2744.02(A)(1) that political subdivisions are not liable in damages.  *See id*; *Wilson v. Stark Cnty. Dept. of Human Servs.*, 70 Ohio St. 3d 450, 639 N.E.2d 105, 107 (1994). The second tier requires analysis of whether the exceptions to immunity in Ohio Revised Code § 2744.02(B) apply.  *See Hubbard*, 780 N.E.2d at 546 ¶ 12.  Finally, immunity can be reinstated under the third tier if the political subdivision can successfully argue that one of the defenses contained in Ohio Rev. Code § 2744.03 applies.  *See Cater v. City of Cleveland*, 83 Ohio St. 3d 24, 697 N.E.2d 610, 615 (1998).

The operation of a sheriff's office is a governmental function for which Brown County has general immunity.  *See* Ohio Rev. Code §§ 2744.01(C)(2)(a) and 2744.02(A)(1).  The Court, therefore, must examine whether any of the exceptions to immunity in Ohio Revised Code § 2744.02(B) apply.  Plaintiff does not assert that any of the exceptions apply,[13] nor does the

---

[13]  In fact, Plaintiff fails to reply altogether to the substance of Defendants' arguments on the state law claims. Instead, Plaintiff contends that, pursuant to Ohio Revised Code § 2744.09(E), chapter 2744 immunity does not apply to her "state law pendent claims" because they derive from "violations of the constitution [*sic*] of the United States." (Doc. 102 at 4272).  This argument makes no sense.  Plaintiff's claims for violations of Goldson's constitutional rights asserted pursuant to 42 U.S.C. § 1983 and her state law tort claims both are based on the same set of facts, but the state law tort claims are not derived from the U.S. Constitution.

Court find that any exception applies. Accordingly, the Court finds that Brown County has statutory immunity for the negligence, assault and battery, and wrongful death claims.

The analysis is similarly straightforward for the negligence claim against the individual Defendants. Statutory immunity applies to "an employee of a political subdivision [in a civil action] to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function" unless one of two exceptions applies. Ohio Rev. Code §§ 2744.03(A). Again, law enforcement is considered a governmental function. Ohio Rev. Code § 2744.01(C)(2)(a); *see also McCloud v. Nimmer,* 72 Ohio App. 3d 533, 595 N.E.2d 492, 495 (1991). The exceptions to statutory immunity for injuries caused by acts in connection with the provision of police services are as follows:

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
>
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner.

Ohio Rev. Code § 2744.03(A)(6). The exceptions do not apply to a negligence claim. "Pursuant to the statute, a police officer cannot be held personally liable for mere negligence . . . ." *Wingrove v. Forshey,* 230 F. Supp. 2d 808, 827 (S.D. Ohio 2002).

Turning to the assault and battery claim against the individual Defendants, federal courts generally find that this state law claim rises or falls with a federal excessive force claim. *See e.g.*, *Folks v. Petitt*, 676 F. App'x 567, 572 (6th Cir. 2017) ("[E]vidence of "gratuitous" force for purposes of an excessive force claim is "sufficient to establish a genuine issue of material fact as to whether [the defendant] acted maliciously or in bad faith in striking and arresting [the plaintiff.]") (internal quotation and citation omitted); *Chappell v. City of Cleveland*, 585 F.3d 901, 916 n.3 (6th Cir. 2009) (finding that a plaintiff who could not prove that the defendant's use

of force was objectively unreasonable also could not prove that defendant acted with bad faith or malicious purpose); *D'Agastino v. City of Warren*, 75 F. App'x 990, 995 (6th Cir. 2003) (reversing a grant of summary judgment to defendant on an assault and battery claim because the court reversed on a § 1983 claim for excessive force). Plaintiff has not established that any particular officer used excessive force at any particular point.

The case of *Evans v. Plummer*, 687 F. App'x 434 (6th Cir. 2017), does not compel a different result. In *Evans*, the officer pointed a taser at Evans's face, threatened to tase her, and told her it would hurt. Evans was not attempting to escape and did not present a threat to anyone. *Id.* at 446. The officer was given qualified immunity on the excessive force claim on the grounds that it was not clearly established by pre-existing law that pointing a taser at an arrestee's face constitutes excessive force under the Fourth Amendment. *Id.* at 444. However, the court stated that a reasonable jury could conclude that the officer threatened Evans with malicious purpose or in bad faith, and therefore, the officer was not entitled to statutory immunity on the state law claim. *Id.* at 446.

The facts here are different. Deputy Wedmore directed profanity at Goldson and made vague threats against him at the hospital, but he never threatened him with a taser. His verbal threats alone would not constitute assault or battery under Ohio law because they were not coupled with a "definitive act" as required for assault or by an actual "offensive physical contact" as required for battery. *Smith v. John Deere Co.*, 83 Ohio App. 3d 398, 614 N.E.2d 1148, 1154 (1993) (defining elements of assault and battery torts under Ohio law); *see also Gerber v. Veltri*, 203 F. Supp. 3d 846, 851 (N.D. Ohio 2016) (re-stating and applying the elements set forth in *Smith*). Back at the jail holding cell, while Goldson was lying on the ground, CO Schadle threatened to tase Goldson if he attempted to stand up while they were

removing his handcuffs and leg shackles.  There is no evidence that he pointed at taser at Goldson, much less pointed at a sensitive part of his body as in *Evans*.  Moreover, the officers had reason to be concerned that Goldson was a threat because he had attacked Deputy Justice while handcuffed and wearing shackles at the hospital.  No reasonable jury could conclude that the threat to use non-deadly force against Goldson if he resisted the officers was malicious or in bad faith in these circumstances.

Next, the Ohio wrongful death statute allows an administrator or executor of a decedent's estate to bring a claim for damages "[w]hen the death of a person is caused by a wrongful act, neglect, or default which could have entitled the party injured to maintain an action and recover damages if death had not ensued."  Ohio Rev. Code § 2125.01.  The wrongful death claim must be predicated upon a separate tort.  *Peters v. DCL Med. Labs. LLC*, 305 F. Supp. 3d 799, 814 (S.D. Ohio 2018).  In this case, individual Defendants are entitled to statutory immunity, and also to summary judgment, on the negligence and assault and battery claims as set forth above. Defendants, therefore, also are entitled to summary judgment on the wrongful death claim.

**D.      State Law Claim for Intentional Infliction of Emotional Distress**

Plaintiff's intentional infliction of emotional distress is asserted against only Corporal Meyer and Deputy Wedmore for their actions at the hospital in responding to the call that Deputy Justice had been assaulted.  (Doc. 2 at PageID 43.)  Under Ohio law, a claim of intentional infliction of emotional distress requires a plaintiff to prove:

> (1) that the actor intended to cause emotional distress or knew or should have known that his actions would result in serious emotional distress to the plaintiff; (2) that the conduct complained of has been so outrageous in character and extreme in degree as to go beyond all bounds of decency; (3) that the conduct proximately caused the plaintiff's injury; and (4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable person could be expected to endure it.

*Day v. Nat'l Elec. Contractors Ass'n*, 82 F. Supp. 3d 704, 709 (S.D. Ohio 2014) (quoting *Ashcroft v. Mt. Sinai Medical Ctr.,* 68 Ohio App. 3d 359, 588 N.E.2d 280, 284 (1990)).

The evidence demonstrates that Corporal Meyer did not use any force against Goldson at the hospital. He also did not direct any threats or verbal abuse at Goldson. No reasonable juror could find Corporal Meyer liable for inflicting emotional distress or for acting with malice or in bad faith. Deputy Wedmore, on the other hand, did not use force on Goldson, but he did call him a "stupid mother fucker" and a "bitch," said that he wanted to "break [his] fucking neck," and threatened that he would get a "welcome party" at the jail. A reasonable jury could find that Deputy Wedmore's conduct in threatening Goldson after he was restrained was intentional, beyond all bounds of decency, and demonstrated malice or bad faith. In such circumstances, Deputy Wedmore would not be entitled to statutory immunity. A reasonable jury also could find that Goldson suffered mental anguish based on the evidence that he repeatedly stated "I didn't mean to" as he was walked to the cruiser and that, according to Defendants, he committed suicide in the jail holding cell a short time later. The Court will grant summary judgment to Corporal Meyer, but deny it to Deputy Wedmore on the intentional infliction of emotional distress claim.

**E.      State Law Claim for Spoliation**

Finally, Plaintiff asserts a claim for spoliation of evidence against Defendants Brown County and Sheriff Wenninger based on alleged tampering with the jail surveillance videos and the failure to secure the sprinkler assembly from holding cell 15 on the night Goldson died. (Doc. 2 at PageID 41–44.) It is not clear, however, that Plaintiff seeks to recover damages for this alleged spoliation. She argues in the Memorandum in Opposition that she is entitled to sanctions and/or an adverse inference jury instruction at trial. (Doc. 102 at PageID 4264–66.)

A claim for spoliation under Ohio law, an intentional tort, requires proof of five elements: (1) pending or probable litigation involving the plaintiff; (2) knowledge on the part of the defendant that the litigation exists or is probable; (3) willful destruction of the evidence by the defendant designed to disrupt the plaintiff's case; (4) disruption of the plaintiff's case; and (5) damages proximately caused by the defendant's actions. *Gliatta v. Tectum, Inc.*, 211 F. Supp. 2d 992, 1011 (S.D. Ohio 2002). The Sixth Circuit standard for a plaintiff seeking an adverse inference instruction based on spoliation is similar:

> [A] a party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (citation omitted).

The spoliation claim regarding the jail surveillance videos is based on the time gaps seen on the video timers and the testimony of the former Brown County Coroner, Judith Varnau. The problem is that the evidence does not support the allegations. Plaintiff cites to only one page of the 344-page transcript from Dr. Varnau's deposition, Doc. 74-15 at PageID 1736. (Doc. 102 at PageID 4266.) Dr. Varnau does not discuss the surveillance videos on that page of her deposition transcript. Elsewhere, although Dr. Varnau complained that the surveillance video was produced in a different format than that in which it was first recorded, she admitted that she had no evidence that the content of the video was changed or tampered with. (Doc. 74-15 at PageID 1671–1673, 1693–94.) Likewise, the time gaps in the surveillance videos are not sufficient to prove that the videos were altered. BCI did not find evidence of video tampering. BCI concluded that any gaps or jumps in time in the surveillance video occurred because the system was designed only to record when it sensed motion.

On the other hand, Plaintiff has established at least a question of fact as to whether the original sprinkler assembly from holding cell 15 was preserved and made available to Plaintiff as evidence in this case. Ray Copple, a technician with D&W Fire Safety, serviced the fire sprinklers in the Brown County Jail. (Copple Dep., Doc. 71-1 at PageID 677.) He changed out the sprinkler assemblies from four holding cells, including holding cell 15, on November 7, 2013, approximately one month after Goldson died. (*Id.* at 682–683; Doc. 71-2 at PageID 705.) It was a part of a larger project to change out all of the jail's sprinkler assemblies. (Doc. 71-1 at PageID 682.) Copple took the sprinkler head assemblies and escutcheon plates from the four holding cells to a storage room at D&W. (*Id.* at PageID 684.) Copple was asked in December 2013 to find the sprinkler head and escutcheon plate from holding cell 15 to return to Brown County so it could be reinstalled in holding cell 15 for the purpose of litigation. (*Id.* at PageID 686–688.) Copple picked one of the four sprinkler head assemblies he had uninstalled from the holding cells on November 7th, but he did not know which of the four sprinkler head assemblies came from which of the four holding cells. (*Id.* at PageID 693–694.) Therefore, Defendants cannot establish that the original sprinkler head assembly from holding cell 15 was preserved as evidence.

However, Plaintiff does not point to any evidence establishing who requested the sprinkler assemblies in the jail holding cells to be replaced in November 2013. She does not point to any evidence establishing whether Defendants discussed preserving the sprinkler assembly from holding cell 15 for litigation. She does not point to any evidence that Defendants were aware prior to Copple's deposition taken in March 2018 that he had not been not able to distinguish one sprinkler assembly from another when he reinstalled a sprinkler assembly in

holding cell 15.  Therefore, she has not established that Defendants had a culpable state of mind when they failed to preserve the original sprinkler head assembly.

Moreover, Plaintiff has not established that the failure to secure the original sprinkler assembly disrupted her case.  The Court acknowledges that one sprinkler escutcheon plate might lay more flush against the ceiling than another given any irregularities in or wear and tear caused to the escutcheon plate.  How flush the escutcheon plate lay against the ceiling could impact the difficulty of tying a sheet around the sprinkler assembly.  However, the Court already has found a genuine dispute exists whether Goldson could have hung himself from the sprinkler head assembly given the physical layout of the holding cell.  Plaintiff's excessive force claims fail, nonetheless, because Plaintiff has failed to marshal evidence supporting an alternative theory of who hung Goldson or how he died.  That is, Plaintiff failed to put forth sufficient evidence establishing that any particular officer took particular actions leading to Goldson's death.  As such, Plaintiff cannot establish damages or prejudice to her case based on the alleged spoliation. The Court will grant summary judgment to Defendants on the spoliation claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 77) is

**GRANTED IN PART AND DENIED IN PART**.  Summary judgment is granted to Defendants

on all claims except for the intentional infliction of emotional distress claim against Deputy

Wedmore.

**IT IS SO ORDERED.**

Dated this 13th day of February, 2019.

BY THE COURT:


S/Susan J. Dlott_____
Susan J. Dlott
United States District Judge